**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Jeffrey S. Yontz,**

*Plaintiff*,

**v.**                                                                      **Case No. 3:13-cv-066**
                                                                             **Judge Thomas M. Rose**

**Dole Fresh Vegetables, Inc.,**

*Defendant*.

---

**ENTRY AND ORDER DENYING DEFENDANT DOLE FRESH VEGETABLES, INC.'S MOTION FOR SUMMARY JUDGMENT. DOC. 44.**

---

Pending before the Court is Defendant Dole Fresh Vegetables, Inc.'s Motion for Summary Judgment. Doc. 44.   Therein, Dole requests that the Court grant summary judgment on Plaintiff Jeffrey S. Yontz's claims for interference with rights under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2611et seq., retaliation for exercising these rights spoliation of evidence. Because Yontz is able to present evidence which, if believed by a jury, would satisfy his burden on every element of every claim, the motion will be denied in its entirety.   The Court's description of the background facts will include Yontz's employment as well as facts relevant to Dole's knowledge of possible litigation, as this is relevant to Yontz's claim for spoliation of evidence.

**I.      Background**

Defendant Dole Fresh Vegetables, Inc. employed Plaintiff **Jeffrey S. Yontz** as a Package Machine Operator from March 2005 until June 24, 2011.   When Dole hired Yontz in March 2005,

Yontz completed a "Pre-Employment Commitment Form," a Dole document which allows employees to notify the employer when they are first hired of commitments for which they might not yet have earned accrued paid time off. Doc. 44-2, at 3, Ex. B. Yontz told Dole about his "yearly" vacation plans at a time-share in Florida. Doc. 61-7, Ex. 7. Yontz has testified that he stays with his family at his parents' time share in Sanibel Island, Florida, the same two weeks (19th week and 20th week of the year) in May every year. Ex. D. During his first year of employment, Yontz requested three and half weeks off for various vacations, one of which was his time share in Florida. Doc. 44-3, Ex. C.

In 2006, Yontz was off for two weeks of unpaid leave. In 2007, Yontz requested paid time off (or Flexible Time Off) for the entire two weeks of his time share. However, prior to him leaving, Dole determined that he did not have enough accrued Flexible Time Off for the entire timeshare period so he was granted an unpaid Leave of Absence for three days of the two-week time period. Doc. 44-5, Ex. E.

In April 2008, Yontz again requested a Leave of Absence for the entire two-week period of his Florida timeshare. Doc. 44-6, Ex. F. His supervisor denied this request. *Id.* Dole's Human Resources Department states that it does not inform employees whether leave requests are approved or denied, it is the employee's responsibility to follow up on requests for time off. Doc. 44-7, Ex. G. Despite the fact that the leave was denied, Yontz proceeded to take the entire two weeks off for his timeshare without his supervisor's approval. Dole suspended Yontz for five days. Doc. 44-8, Ex. H. In October 2008, Dole suspended Yontz for insubordination. Doc. 44-9, Ex. I.

At the end of March 2009, Yontz initially requested a leave of absence for five days of his timeshare vacation and requested Flexible Time Off for the rest. The request was initially denied

2

by one of his supervisors. Ex. J.  Yontz subsequently completed another leave of absence form for only four days, which was approved by another supervisor. Ex. K.

In February 2010, Yontz again requested an unpaid leave of absence for the entire two weeks of his Florida timeshare. Ex. L.  The denial was personally given to Yontz by Jim Graham, HR Manager, with a notation by Graham that "vacation is not a subject for a Leave of Absence." *Id.*  Following this attempt, Yontz acknowledged that he was aware that his practice of trying to take any unpaid leave of absence to stay at his Florida timeshare would no longer be approved or tolerated by the Company. Ex. M.

Yontz and his wife, Kelley, had learned that they were expecting their second child. Yontz sought and completed the appropriate FMLA forms to take leave for the birth. Doc. 61-14, Ex. 14.  Kelley's OB/GYN completed the appropriate certification, estimating Yontz would need eight weeks of leave, beginning March 26, 2010. *Id.*

Dole's HR Coordinator and FMLA administrator, Yasminka Landaburu, was suspicious about the eight weeks designated by Kelley's physician. Landaburu Depo., 11-12; 38. Landaburu contacted the physician, who confirmed that eight weeks was correct and appropriate. Landaburu Depo., 38 ("Q. So at that point after you had talked to the nurse the second time your concerns were put to rest? A. Correct."); Ex. 15 (physician's office confirmed "that the period of incapacity was for 8 weeks due to a C-Section"). Dole approved Yontz's request for FMLA leave on March 14, 2010.
Ex. 16.

The Yontzs' daughter Lacey was born on March 24, 2010, with Down syndrome. Yontz Depo., 24; Ex. 18.

In the meantime, unbeknown to Yontz, Dole's management chain continued to discuss their apparent dissatisfaction and suspicion of the timing of Yontz' FMLA leave for the birth of his daughter. Ex. 19.  Two weeks after Dole approved his leave, and less than a week after Lacey was born, they held a conference call. Human Resources Coordinator and FMLA Administrator Yasminka Landaburu, Dole's Vice President of Labor Relations in California Danny Urbano, and Dole's in-house counsel David Buffington, also in California, discussed Yontz's FMLA leave.   Landaburu noted:

> 3/30/10 Meeting with Danny Urbano and David Buffington. Because Jeff Yontz' wife had a baby nothing can be done, but Jim [Graham] will give Jeff a warning upon return that will state that if EE [employee] is here next spring 2011 (when his timeshare comes up) he will not be automatically allow [sic] unless he has accrued enough vacation time and has been approved by Supervisor/Manager and that if he requested FMLA during that period it would be heavily scrutinize[d].

Ex. 19. Graham recalled in an email to Urbano and Landaburu the following year that they "warned [Yontz] last year about abusing the policy when he takes his annual vacation to [F]lorida." Ex. 20.   Graham referred to Yontz as "our 'pro[b]lem child' /Prima donna PMO." *Id.*

On May 28, 2010, when Yontz's eight weeks of FMLA leave ended, he submitted an additional FMLA request for intermittent FMLA leave to care for Lacey. Ex. 18.   Lacey's physician completed the required medical certification. *Id.*   He estimated that Yontz would need approximately 2-5 days per month to care for Lacey in a variety of ways, including routine evaluations, follow-up with various physicians, including a number of specialists, as well as "episodic flare-ups periodically preventing the patient from participating in normal daily activities," caused by her Down Syndrome. Doc. 61-18, Ex. 18, at 4.   Landaburu sent Yontz a

letter confirming his remaining FMLA time on June 18, 2010. Ex. 21. She also asked for a medical re-certification. *Id.*

The next year, despite the prior years' admonitions, Yontz requested Flexible Time Off only for a portion of his annual two-week timeshare during May 2011. Ex. O; Exs. 22-24. He requested May 7, May 11-14, and May 18 off. *Id.* On May 6, 2011, Yontz called in and took the day off, earning one attendance point under Dole's attendance policy. Pl. Ex. 25. At this point, he had a previous absence from April 23, 2011, for a total of two points. *Id.* Although the two-week Florida timeshare ran from Saturday, May 7, 2011 to Saturday, May 21, 2011, Yontz only requested Flexible Time Off (which was approved by his supervisor in advance) for the period ending May 18, 2011. Exs. D and O.

The evening of Tuesday, May 17, 2011, as the Yontz family was preparing to leave Florida and make the drive home, one-year old Lacey got sick. Yontz Depo., 74. Because of her Down syndrome, Lacey was born with a short-bridged nose. Yontz Depo., 58-60. The short bridge causes mucous to run down her throat, rather than out her nose, ultimately making her throw up. Yontz Depo., 58-60. On this occasion, the Yontzs believed additional mucous was caused by Lacey's teething. Yontz Depo., 58-59.

Lacey vomited repeatedly. Believing they understood the cause of Lacey's symptoms, the Yontzs did not take Lacey to the doctor. Yontz Depo., 58-60. Facing a 17-19 hour drive with a vomiting one-year old child with Down syndrome, the Yontzs decided it would be better for Lacey to postpone their drive home. Yontz Depo., 58-63. Yontz called Dole, notifying them that he was utilizing his intermittent FMLA for May 19, 2011.

When the situation with Lacey did not improve the following two days (May 20 and 21), Yontz again called Dole and used his FMLA leave. Yontz Depo., 58-63. When Lacey improved,

5

the Yontz family trekked back to Ohio on Saturday, May 21, 2011. Yontz Depo., 92. Monday,

May 23, 2011 was Yontz's day off, but on call. Yontz Depo., 89-90. That day, Lacey needed

Yontz at home, as her normal caregiver had a medical issue. Yontz Depo., 89-90. Although he was

never called in, Yontz called again on May 23, to let Dole know he would need to use FMLA that

day if called:

> When I came back, I had an issue with a babysitter, and the only
> reason there was an issue with the babysitter is because that's my
> day off and I wasn't scheduled to work, and I called the company
> ahead of time saying, hey, just in case you call me to work on my
> day off, I'm telling you, I can't come in. I left that on the voice
> message.

Yontz Depo., 89-90. Dole disputes that Yontz was not called in to work. Doc. 59. 77-79, Bravo

Depo., 75-77, PageID # 5754 – 5756 (testifying that she scheduled Yontz for mandatory overtime,

but kept all records by memory). Cf. Doc. 44-17, 2-3, Ex. Q; see also Exs. D & O.

Dole initially approved Yontz's requested FMLA leave for May 19, 20, 21, and 23.

Termination Notice, Ex. 26 ("We approved your FMLA request…"). Then, consistent with the

admonition to Yontz, on May 25, 2011, James Graham had Human Resources Coordinator

Yasminka Landaburu request documentation from an "authoritative source," that Yontz's taking

off work on May 19th, May 20th, May 21st, and May 23rd was for his approved intermittent

FMLA leave and not for simply staying in or coming back from Florida. Exs. R and S, Graham

Email, Ex. 20 ("I asked Yasmina to ask him to provide documentation for the absence");

Landaburu Notes, Ex. 2 ("I requested to Jeff to provide documentation for his absences on 5/19,

5/20, 5/21, and 5/23/11 (per Jim's request).")).

When Yontz returned to work on May 25, 2011, his next scheduled work day, Landaburu

met with Yontz about documenting FMLA intermittent leave for those four days. Ex. R. After

6

Yontz advised Landaburu that he had to call in for FMLA for those four days due to his child's therapist being sick, she asked him to provide documentation from an authoritative source such as the therapist's doctor or employer. Exs. T and U.

Landaburu met with Yontz on May 25, 2011. She asked him for documentation justifying his FMLA leave. When she asked "for a Dr. note," (Ex. 27, 9 Yontz told Landaburu that his daughter had been sick, but did not see a doctor. Yontz Depo., 75-76. He also told Landaburu that Lacey's normal caregiver was herself seeing a physician and that he needed to be home with Lacey:

> Q. Did you ever tell anyone from Dole that your daughter was sick?
>
> A. Other than calling in FMLA? During that time or ever?
>
> Q. You can start first of all, you can start then.
>
> A. During that time I called in FMLA, you don't give a reason, and when I returned I mentioned to, I mentioned to a couple of people what had happened.
>
> Q. Who[m] did you tell?
>
> A. Yasminka is one. *** I told her on the 25th.
>
> Q. What did you tell her? You told her your daughter Lacey was sick those three or four days?
>
> A. I said she was sick and vomiting and when we returned, I had a babysitter issue. Those are the two different events that I told her.
>
> Q. Who[m] else did you tell?
>
> A. I'm thinking Melissa Kelley was a lead in the production room. Melissa Johnson or Bravo was a supervisor at the time that day. I mentioned it to her. She came over to talk to me.
>
> Q. Did you continue, is that what you told the company throughout the next few weeks that your daughter was sick on three of the days

7

> and then you had sitter issues on the last day.   Is that what you are
> claiming you told the company?
>
> A. I told the company on the 25th those two events occurred.

Yontz Depo., 75-76. Landaburu disputes that Yontz told her that his daughter was sick.

Landaburu Depo., 79-80. However, they agree that Landaburu also asked Yontz to have

Lacey's physician re-certify FMLA, and that Dole would allow him to return the recertification

after a routine doctor visit scheduled for June 20, 2011. Landaburu, 79-80.   When the meeting

ended, Landaburu indicated that Yontz stated "he would see what he could do," but never stated

there was no doctor involved or that he could not get the documentation. Ex. V.

When Yontz failed to provide any documentation to Landaburu over the following three

weeks, she again met with Yontz on June 15, 2011, in the HR office.   On June 15, 2011,

Landaburu again met with Yontz. They discussed the recertification, which was to be provided

after Lacey's June 20 doctor appointment. Ex. 2.   Landaburu again asked for documentation

justifying the four days of Yontz's FMLA leave. Affidavit and Transcript of Audio Recordings,

Ex. 28.   Yontz again told her that "there is no doctor involved" with Lacey's care on those days.

Transcript, Ex. 28, p. 1.[1] Landaburu then focused on Lacey's sitter and suggested that Yontz's

wife should have stayed home. *Id.*   Yontz said he did not know what they wanted him to provide.

Landaburu said she would follow up:

> Landaburu: So let me talk to [Jim?] and see.
>
> Yontz: Apart from a statement from her doctor, which is probably
> out of the question.   I mean, what, I don't have any idea what you
> guys are wanting.   That has nothing to do with me.
>
> Landaburu: He wanted to make sure that you provide some kind of
> justification for those four days.

---

[1]  Yontz secretly recorded his meetings with Dole Human Resources representatives.

Ex. 28. There is no record that Landaburu followed up with Yontz after talking to Graham.

Landaburu testified she knew there would probably be a legal issue with Yontz at this point and

began keeping notes:

> Q. And did you type them because, again, like you said before, because you knew there was probably going to be an issue?
>
> A. Yes, probably. ***
>
> Q. Did anybody ask you to sign this, because I haven't seen your signature on the notes that you've made previously?
>
> A. Probably someone asked me, yes. I wouldn't sign my notes if not. ***
>
> Q. So if you signed this on the 16th it would have probably been because Lisa would have asked you to?
>
> A. Yeah, it could be, yeah, because it was going to be legal, a legal paper, or if there was any need I would do that. ***
>
> Q. So at that point you knew there was going to be a legal issue?
>
> A. Or we could expect that, uh-huh.

Landaburu Depo., 137-138. Landaburu also signed her notes from May 25, 2011. Ex. 29. Her

notes reflect that Yontz told Dole "that what we were asking him was illegal. That if he is pointed

out and termed there will be legal consequences, that he has already been advice [sic]." Ex. 2; see

also Amended Answer, Doc. No. 39, PageID 461 (admitting that Yontz alleged Dole's actions

were illegal).

Landaburu brought the issue back to Graham, who emailed Urbano:

> this is our "prolem child" / Prima donna PMO from Springfield. The one we warned last year about abusing the policy when he takes his annual vacation to florida. He has already had a "last chance" agreement, and last year, you and i and David Buffington got

> together and crafted a letter to him to prepare for this year.  this
> year, he has tried to use "FMLA" to stretch the time off, and when
> he came back, I asked Yasmina to ask him to provide
> documentation for the absence. he has not done so, and now faces
> possible termination for absenteeism points according to our policy.

Ex. 20 (errors sic). Dole could not produce the letter referenced in the email in discovery.

The next day, June 16, 2011, Yontz met with Landaburu, Lisa Cole, and Heather

Hunt.  After inquiring into the recertification paperwork, and Yontz again expressing that

Dole's request for additional documentation was illegal, he was suspended:

> Yontz: Well, we are still at a stalemate because I don't know, I don't
> know what to provide. I don't have any idea what you want me to
> provide.
>
> Cole: Okay. Well.
>
> Yontz: I could write something out, you can put it in my file. I don't
> know what you want.
>
> Cole: Okay. Well this is where, and I'll just say, this is where [it]
> stands right now, because the fact that you did miss 5/19, 5/20, 5/21
> and 5/23 and you were requested to provide that documentation,
> currently right now it stands at those four days stands as unexcused
> absences. And you have one unexcused from January and then also I
> think from April.
>
> Yontz: April or May.
>
> Cole: Exactly, so that would put you at 6 points. So, currently right
> now, you're, as of today, you're going to be suspended pending
> review.
>
> Yontz: Because you guys think I'm abusing something.
>
> Cole: I didn't, nobody is saying that, what I'm saying is the…
>
> Yontz: For me to call in. For me to follow the rule book and I call in
> and state FMLA and you guys to say it's not, I mean obviously you
> don't think it was.

10

Cole: Well the thing about [it] is, Jim asked you to provide the document, the main issue right now is that Jim asked you to provide the documentation and you have not done so. And then actually, I mean, if Yasminka would not have called you in yesterday, were you even going to get back with us and let us know.

Yontz: On the 20th, I was going to provide the doctor's documentation.

Cole: I know, but the doctor's documentation is separate from being at home with your child. The FMLA is medical documentation for the medical aspect.

Yontz: Well, if you were in my shoes, what would you have provided?

Cole: Something from, I would have gotten something from some agency, or from them.

* * *

Yontz: She has nothing to do with the agency.

Cole: But if the agency recommended her. I mean I don't think they would have recommended her. I mean 'cause otherwise it's just a babysitter. Is basically what it would be. It would be just a babysitter. And still wouldn't be in that, and that still wouldn't be I mean you know we have lots of employees that call in because they don't have babysitters, but they still receive you know, they still receive attendance _____. So but like I said, the main issue is that No. 1 is that Jim asked you to provide that documentation which has been close to a month ago and you still haven't been able to provide anything nor have you followed up with Yasminka or Jim or me on the documentation.

Yontz: Two weeks ago, two weeks ago, I believe Monday, when they asked me. At the time you wanted recertification. _____

Cole: That was on 5/25 and today's the 16th, so not quite a month. Almost 3 weeks, cause Yasminka said that she asked you for it on 5/25 and today's the 16th. So, _____, were you going to sign, if you refuse to sign it. So as of right now, as of today, you will be suspended. ***

11

> Yontz: So, again, let me ask you again – what documentation would you have provided?
>
> Cole: Well, like I said Jeff from some type of, like Yasminka told you, from someone that you're involved in with the agency that would have been able to, I mean 'cause otherwise, if you asking me for documentation for a babysitter, there is no documentation for a babysitter and if it just a babysitter, then babysitting is not covered under FMLA. FMLA is for medical conditions and not for babysitters. We have lots, employees that call in everyday because they don't have babysitting.
>
> Yontz: Yeah, I understand that. She's just not a standard child.
>
> Cole: I know, I totally understand that. I totally do.
>
> Yontz: I have FMLA papers for a Down syndrome child.

Ex. 28, pp. 4-6. See also Hunt's Statement, Ex. 30.

Between June 16 and June 24, 2011, Dole's management discussed the situation. Privilege Log, Ex. 31. On June 24, 2011, Lisa Cole signed Yontz's Termination Notice. Ex. 26. Although she testified she did not prepare it, and agreed it was inaccurate, it appears that Cole and Buffington discussed the contents of the letter before it was sent. Ex. 31; Cole Depo. 85-89 ("some of the things, there are some misstatements in here.").

Yontz filed for unemployment compensation. Dole challenged his claim, and the parties participated in a hearing on November 7, 2011. Ex. 3. Yontz also filed a complaint against Dole with the Department of Labor on or around June 22, 2011. Amended Complaint, Doc. No. 36, PageID 444; DOL Complaint, Ex. 4. Dole's in-house counsel officially responded to the complaint on September 9, 2011 in a written response. Ex. 5.

On November 16, 2011, the Department of Labor's Wage and Hour Division informed Yontz that it had found Dole had violated the FMLA, but Dole refused to settle with Yontz:

> Based on the Findings of a Family and Medical Leave Act (FMLA) investigation conducted by the Wage and Hour Division (WHD) of the above named employer, you were found to be owed $9,288.00 in unpaid compensation. Specifically, the company violated the FMLA but did not agree to correct the violation.
>
> The WHD contacted the employer, explained the FMLA requirements, and requested settlement, including payment of wages o[n] your behalf. The employer would not agree to a settlement or to pay the unpaid wages owed to you.

Ex. 6 (emphasis in original). The DOL told Yontz he had a right to bring a private lawsuit against Dole. *Id.* Yontz timely filed this action on March 4, 2013. Complaint, Doc. No. 1.

Yontz filed a First Amended Complaint on April 8, 2014, the First Claim for Relief in the First Amended Complaint combines claims for FMLA interference and retaliation. Doc. 36 at 7. The other claim is a claim for spoliation. Doc. No. 36. This Motion followed. Doc. No. 44.

## II.     Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. See *Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   Consequently, the central

issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad*, 328 F.3d at

234-35 (quoting *Anderson*, 477 U.S. at 251-52).

**III.    Analysis**

**A.    FMLA Interference Claim**

"To successfully present a *prima facie* case of FMLA interference, Plaintiff must show

"'that (1) he was an eligible employee; (2) Defendant was an employer subject to the FMLA; (3)

he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take

FMLA leave; and (5) Defendant denied him FMLA benefits to which he was entitled." *Romans v.

Mich. Dep't of Human Servs.*, 668 F.3d 826, 840 (6th Cir. 2012) (internal citations omitted).

Dole argues that Yontz, too, received all the FMLA leave to which he was entitled,

including "the four days in question in May 2011." Motion, PageID 512.   A reasonable juror

could find that this was not the case.   Yontz was approved for FMLA leave, and Dole initially

approved the four days in May 2011. Ex. 26.   If these absences were properly excused as FMLA

leave, he would not have received four attendance points, and would not have been terminated. See

Urbano Depo., 32.   If, however, Yontz did not receive those four days as FMLA, then he did not

receive all the FMLA leave to which he was entitled.   Dole asserts that Yontz "has produced no

evidence besides his testimony and the testimony of his spouse that those four unexcused absences

were allegedly covered by the FMLA." Motion, PageID 514.   The Yontzs' testimony, however, is

evidence. Their testimony, if believed by a jury, would establish that Lacey was ill and needed care

on May 19- 21, 2011. Yontz Depo., 58-60; Kelley Depo., 1, 78.

According to Dole, *Hrometz v. Local 550 Intern. Ass'n, of Bridge Const. and Ornamental Iron Workers*, 135 Fed. App'x 787, 791 (6th Cir. 2005) rejects Yontz's position.  "There, the Sixth Circuit noted the plaintiff only provided his testimony and failed to provide medical evidence to support his allegations. The Court concluded that the plaintiff had failed to provide corroborating evidence and thus, did not raise sufficient questions of fact to overcome the motion for summary judgment." Doc. 71, at 5.

The Court does not perceive the relevance of *Hrometz*, which held that "A claim of emotional distress resulting from a LMRDA, [Labor-Management Reporting and Disclosure Act], violation must be supported by physical manifestations-actual injury is a required element." *Hrometz v. Local 550 Intern. Ass'n., of Bridge Const. and Ornamental Iron Workers* 135 Fed. App'x 787, 791 (6th Cir. 2005).  Dole provides no basis for extending LMRDA case law to FMLA claims.   Even if it did, Yontz has not presented an emotional distress claim.

Dole also cites to a *per curiam* unpublished opinion in support of its claim that Yontz must adduce evidence to corroborate his testimony.   "Also, in *Turpin v. Mueller*, 37 Fed. App'x 151, 154 (6th Cir. 2002), the Court similarly found that the plaintiff had offered no corroborating evidence to support his story."   The Court does not believe that the Sixth Circuit intended to announce a sea change in summary judgment law in an unpublished *per curiam* opinion.   If anything, this statement in *Turpin* exemplifies the shortcomings of the production of unpublished *per curiam* opinions. See Alex Kozinski, *The Appearance of Propriety*, *Legal Affairs*, Jan.-Feb. 2005, at 19; Penelope Pether, *Sorcerers, Not Apprentices: How Judicial Clerks and Staff Attorneys Impoverish U.S. Law*, 39 Ariz. St. L.J. 1 (2007); and K.K. DuVivier, *Are Some Words Better Left Unpublished?: Precedent And The Role Of Unpublished Decisions*, 3 J. App. Prac. & Process 397, 411 (2001) ("Some argue that unpublished opinions are dreadful in quality. Because the judges

and their support staff spend less time on these opinions, they may not be the literary models that the courts would like to produce as opinions." (Internal quotes omitted)). Suffice it to say, a reasonable juror could believe the Yontzs' testimony, and that is enough.

Dole also asserts that the FMLA Certification here does not support the Yontz's need to care for Lacey in May 2011, as it only authorizes him to take her to doctor or therapy appointments. Motion, PageID 513-514. However, the Certification anticipates that Lacey's Down syndrome will "cause episodic flare-ups periodically preventing the patient from participating in normal daily activities." Ex. 18, page 4, top. Her physician estimated 2-5 days per month would be excused. *Id.* That is what the Yontzs testify happened here. According to them, Lacey's physiology – her short bridge – caused her to become sick and vomit because the mucous went down her throat, rather than out her nose. Yontz Depo., 58-60; Kelley Depo., 65. If this is what happened, Yontz was entitled to use FMLA leave to care for Lacey those days. See also 29 C.F.R. § 825.202(b) (intermittent medical leave "may also be taken to provide care or psychological comfort to a covered family member with a serious health condition.").

Dole similarly asserts that the medical certification does not provide coverage for the day Yontz was needed at home because his regular sitter was unavailable. Motion, PageID 514-515. The FMLA regulations explicitly say:

> The medical certification provision that an employee is needed to care for a family member *** includes situations where the employee may be needed to substitute for others who normally care for the family member ***. The employee need not be the only individual or family member available to care for the family member or covered servicemember.

29 C.F.R. § 825.124 (a), (b). It also includes "a situation *** where the employee is only needed intermittently--such as where other care is normally available, or care responsibilities are shared

with another member of the family or a third party." *Id.,* at (c).   The behavior Yontz describes himself engaging in on May 23 was within the scope of the medical certification and the FMLA.

Yontz asserts he has presented a *prima facie* case of FMLA interference.   The burden thus shifts to Dole to articulate a legitimate, non-discriminatory reason for his termination.   Dole asserts that its decision was based on Yontz's "failure to document that he was off work for an FMLA covered reason." Motion, PageID 506.   It argues that fraud and dishonesty are legitimate, nondiscriminatory reasons for termination. *Id.*


Dole counters, "Defendant's termination of Plaintiff was not based upon "fraud," but Defendant's reasonable belief that Plaintiff was at or returning from his Florida timeshare on those days."   Dole claims as a legitimate nondiscriminatory reason for termination Dole's "honest belief" that Yontz "mis-used his pre-approved, intermittent FMLA leave." Motion, PageID 506-508.   Dole may not use an honest mistaken belief that Yontz misused FMLA leave as a legitimate non-discriminatory reason for his termination. See *Saulter v. Detroit Area Agency on Aging,* No. 12-2203, 2014 U.S. App. LEXIS 6323, *49 (6th Cir. 2014), citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) ("an employer may prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee.").   Here, the attendance points themselves violate the FMLA.   *Demyanovich v. Cadon Plating & Coatings, L.L.C*., 747 F.3d 419, 429 (6th Cir. 2014) ("If an employer takes an adverse employment action at least in part because an employee requested or took FMLA leave, the employer has denied an FMLA benefit."); 29 C.F.R. § 825.220(c) ("employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies."). That Yontz received attendance points for

using what may have been legitimate intermittent FMLA leave is the problem, not a legitimate, non-discriminatory excuse for the problem.

Dole asserts that the honest belief rule protects it from liability for terminating Yontz. Motion, PageID 506-508, 515. The Sixth Circuit has not decided whether the rule applies to FMLA interference claims. *Tillman v. Ohio Bell Tel. Co.,* 545 Fed. App'x 340, 354 (6th Cir. Ohio 2013). To so rule would be to reward and encourage ignorance of a law our democratic process has seen fit to enshrine in law.

However, even if one were to apply the honest belief rule, it is not as absolute as Dole describes it:

> "[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 807. The employer's decision-making process need not be optimal, or leave no stone unturned; "[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* If the employee proves the employer failed to do so, the employer's decision-making process is "unworthy of credence . . . [and] any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.*

*Murphy v. Ohio State Univ.,* 549 Fed. App'x 315, 322 (6th Cir. 2013), citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).

Here, Dole had in its possession the FMLA certification authorizing the FMLA leave Yontz claimed. Thus, a reasonable juror could find that Dole did not make a reasonably informed and considered decision before terminating Yontz.

**B.** **FMLA Retaliation Claim**

18

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) he was engaged in an activity the FMLA protects; (2) defendant knew he was exercising his FMLA rights; (3) defendant took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Jaszczyszyn v. Advantage Health Physician Network*, 504 Fed. App'x 440, 447 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)).   Unlike the interference theory, in a retaliation theory, motive is relevant "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Seeger v. Cincinnati Bell Tele. Co., LLC*., 681 F.3d 274, 282 (2012) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)) (emphasis in original).

Dole challenges whether Yontz can prove causal connection, submits that it had a legitimate, non-discriminatory reason for terminating Yontz, and challenges Yontz's ability to show pretext. Motion, PageID 504-505.   In challenging pretext, Dole again relies on its "honest belief" that Yontz was engaged in wrongdoing. *Id.* at PageID 506-508.

Dole first asserts that there is no causal connection between Yontz's FMLA use and his termination. Motion, PageID 494, 504-505.   A "causal connection is established by showing that the employer would not have taken the action but for the employee's protected activity." *Branch v. Schostak Bros. & Co*., 2013 U.S. Dist. LEXIS 70227, *12-*13 (E.D. Mich. May 17, 2013), citing *Agee v. Northwest Airlines*, 151 F.Supp.2d 890, 896 (E.D. Mich. 2001) "Furthermore, 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.'" *Id.*, citing 29 C.F.R. § 825.220(c).   Yontz has presented evidence that, if believed by a juror, would show that Dole terminated Yontz because of his use of FMLA leave.

Dole's, stated non-discriminatory reason for terminating Yontz is facially discriminatory. Just as protection under the honest belief rule would only be afforded if the honest belief was unrelated to the right protected, so must the non-discriminatory reason be unrelated to the forbidden discrimination. Dole has failed to state a non-discriminatory reason for terminating Yontz.

**C.      Spoliation Claim**

Under Ohio law, a spoliation claim contains the following elements: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts[.]" *Smith v. Howard Johnson Co., Inc*., 615 N.E.2d 1037, 1038 (1993).

Dole asserts there is insufficient evidence on the first and second elements of spoliation, i.e., pending or probable litigation involving the plaintiff, and knowledge by the defendant that litigation exists or is probable. Motion, PageID 515-516. Dole claims it did not know litigation was pending or probable. Motion, PageID 516. A reasonable jury could find otherwise. Dole knew or should have known that litigation was possible, at the very least, on July 6, 2011, when the Department of Labor told Dole about the investigation and instructed Dole to preserve its records. Ex. 33. Motion, PageID 502.

Dole submits that it never received a response to its September 9, 2011 position statement, and therefore considered the matter closed. Motion, PageID 517. To the contrary, the Department of Labor's letter states that it spoke with Dole:

> Specifically, the company violated the FMLA but did not agree to correct the violation. The WHD contacted the employer, explained the FMLA requirements, and requested settlement, including

> payment of wages o[n] your behalf.   The employer would not agree
> to a settlement or to pay the unpaid wages owed to you.

Ex. 6 (emphasis added).   If anything, this is a factual dispute.

Dole also submits that its managers did not interpret Yontz's comments that there would be "legal consequences" to really mean there would be legal consequences. Motion, PageID 518.   A reasonable juror could easily dismiss this claim, particularly where Landaburu specifically testified that she knew there would be a legal issue with Yontz. Landaburu Depo,120-121, 130, 136-138.   There is at least a genuine dispute between the parties as to whether Dole knew that legal action was probable under the circumstances.

Dole also submits there was no willful destruction of evidence. Motion, PageID 518-519. However, Dole's IT professionals testified that "there has not been any automatic deletion" from its system. Calderon Depo., 13 57-59.   Calderon agreed that "the only way that emails could have been deleted on Dole's system in relation to 2011 and Yontz would have been manually by an end user." *Id.*, 57.   Otherwise, all the email is kept in the archive. Id., 57-59.   To the extent that email is missing – and Cole testified that she received emails, but did not find them when she searched for them – a reasonable juror could find it was deleted by an employee. Cole Depo., 15-16 (Cole searched for email); 68 (Cole did not find the emails she was copied on when she searched).

The letter Graham and Urbano drafted the year before to prepare to discipline Yontz in 2011 also cannot be found. See Ex. 20.   No contextual documents have been produced to describe the FMLA and Flexible Time Off policy change Yontz prompted in 2010. See Ex. 32.

The "'culpable state of mind' element is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *Owner-Operator Indep. Drivers Ass'n v. Comerica Bank*, 860 F. Supp.2d 519, 539 (S.D. Ohio

2012) ("Plaintiffs' counsel admitted at trial that a litigation hold was never placed on OOIDA's files related to the litigation. For that group of destroyed documents, therefore, Plaintiffs and their counsel were at least negligent in allowing its destruction, and sanctions may be imposed as a remedy.") (internal citations omitted). The jury could find the same here.

Dole attempts to use its steps during discovery to recover undeleted email to justify its failure to implement a litigation hold.  These are separate issues.  Dole was required to implement a litigation hold by law, and its own policies:

> Under no circumstances will employees permit the destruction or loss of records, in electronic or hard copy, if the employee has any reason to believe that the records are related to any notification of a threatened or filed lawsuit, or of an investigation that may result in a lawsuit.
>
> Company has a duty to refrain from deleting or destroying any record or communication to the extent that any such record or communication relates to a threatened or pending lawsuit, filed lawsuit, or investigation. The destruction of information by anyone with knowledge that may relate to a threatened or pending lawsuit, filed lawsuit, or investigation may lead to liability for spoliation of evidence.

Dole's Email Management Policy, Ex. 35, p. 8. Legal counsel Buffington agreed that it was always Dole's position that it had a duty not to destroy records under a legal hold, even before the written policy was put in place. Buffington Depo., 30-31.   Dole's Director of IT Solutions, Joanna Dyer, testified that "all HR-related key-words [in an email] have a ten-year retention."

Where Dole's own policies require retention, and there is testimony documents were not retained but manually deleted by the user, there is a genuine issue for the jury.

Dole argues that Yontz's case has not been disrupted. The evidence Dole has been unable to produce are relevant to the jury's determination of Dole's claimed good faith or pretext.   There remains a genuine dispute as to whether the missing items have disrupted Yontz's ability to make

22

those showings.  Thus the Court will deny Dole's Motion for Summary Judgment on Yontz's spoliation claim.

**IV.**    **Conclusion**

Because there exists a genuine issue of material fact regarding whether Yontz was entitled to FMLA leave in May 2011, and because there is a genuine issue of material fact as to whether Dole retaliated against Yontz for exercise of FMLA rights and because there is a genuine issue of material fact as to whether Dole spoliated evidence, Defendant Dole Fresh Vegetables, Inc.'s Motion for Summary Judgment, Doc. 44, is **DENIED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, October 10, 2014.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE